**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 3:09-00064 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| NORMAN J. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**M E M O R A N D U M**

The United States filed this action against the Defendant charging him with possession of child pornography.

Before the Court is Defendant Norman J. Smith's renewed[1] motion to suppress (Docket Entry No. 85) contending, in sum: that on February 27, 2007, the agents unreasonably seized him; that the agents' subsequent entry into his home and seizure of his computer inside his home violated his Fourth Amendment right to be free from unreasonable searches and seizures; that his delusional condition precluded his ability to consent to the inspection, search and seizure of the computer from his residence; and that his involuntary statements to the agents without any Miranda[2] warnings violated his Fifth Amendment right not to incriminate himself.

In response, the Government argues that the agents' encounter with Defendant was a permissible "knock and talk" in which Defendant voluntarily agreed to answer the agent's questions

---

[1] The Defendant's original motion was denied without prejudice to renew upon completion of a competency evaluation of the Defendant. For reasons unclear to the Court, the Order for the evaluation at the Fort Butner facility was delayed, and the first evaluation was at a Kentucky facility.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

and freely consented to the agents' entry into his residence and the seizures of his computer and disks.

The Court had to conduct a bifurcated suppression hearing. At the first hearing, defense counsel had reservations about his ability to proceed, but after a conference, the hearing was limited to the examination of the agents, at least one of whom was from out-of-state. At the second hearing, Defendant testified, and both parties presented expert proof on Defendant's ability to consent in these circumstances. Set forth below are the Court's findings and conclusions of law.

## A. Review of the Record

### 1. The Initial Encounter

According to the two agents, on February 27, 2007, at approximately 5:45 p.m., David Mackdanz and Nicholas Nelson, agents of the Immigration and Customs Enforcement ("ICE"), arrived at Defendant's residence in a rural area in Montgomery County, Tennessee. Mackdanz and Nelson drove their vehicles into Defendant's driveway, which is horseshoe shaped with two entrances and exits onto the road. Mackdanz and Nelson were at Defendant's residence based upon a lead from a national investigation relating to child pornography in January 2006 that the agents received in February 2006.

This January 2006 lead described an individual with the screen name for the alleged purpose of renewing a subscription to a website. According to Mackdanz, this website contained child pornography. On February 27, 2007, neither Mackdanz nor Nelson knew if Defendant's computer contained child pornography nor if Defendant possessed a computer on that date. Mackdanz used billing information to identify Defendant's address. Mackdanz agreed that the information was too stale to obtain a search warrant, and for this reason, the agents went to the Defendant's home on February 27, 2007. According to Mackdanz, based upon his training and experience persons who

view child pornography tend to retain the images. On cross-examination, Mackdanz agreed that for this encounter, the agents utilized the "surprise technique." (Docket Entry No. 108, Transcript of First Hearing at 55).

On the agents' arrival at Defendant's property, Mackdanz and Nelson parked Mackdanz's vehicle in Defendant's driveway entrance, blocking forward movement of any vehicle through the horseshoe shaped driveway entrance. Mackdanz and Nelson were in an unmarked vehicle and in plain clothes. Both agents wore bulletproof vests, but only Nelson's vest was marked police on the back of it. The agents' vests obscured their weapons, but Mackdanz stated that at some point, the Defendant would have seen his weapon. At that time, it was dusk and getting dark[3] in a rural area.

---

[3] Although Mackdanz described the agents' arrival time as 5:45 p.m., the Defendant testified that he left work at 5:30 p.m. and upon arrival at his home fell asleep in his vehicle for about an hour or so. Given the agents' testimony that as they arrived at the vehicle it was getting dark, the Court does not deem this a material dispute. According to National Weather Service in Pall Mall, Tennessee on Tuesday, February 27, 2007, the weather conditions for Pall Mall, Tennessee were as follows:

| Astronomy | | |
|---|---|---|
| | Rise | Set |
| Actual Time | 6:13 AM CST | 5:31 PM CST |
| Civil Twilight | 5:47 AM CST | 5:57 PM CST |
| Nautical Twilight | 5:17 AM CST | 6:27 PM CST |
| Astronomical Twilight | 4:47 AM CST | 6:57 PM CST |
| Moon | 1:20 PM CST (2/27) | 3:54 AM CST (2/27) |
| Length Of Visible Light | 12h 10m | |
| Length of Day | 11h 18m | |

http://www.wunderground.com/history/airport/KEKQ/2007/2/27/DailyHistory.html?req_city=NA&req_state=NA&req_statename=NA&MR=1 (Last viewed May 18, 2012)

Civil Twilight - The time period when the sun is no more than 6 degrees below the horizon at either sunrise or sunset. The horizon should be clearly defined and the brightest stars should be visible under good atmospheric conditions (i.e. no moonlight, or other lights). One still should be able to carry on ordinary outdoor activities.

Upon leaving their vehicle at the residence's driveway entrance, the agents approached the Defendant's residence with Mackdanz going to the residence and Nelson inspecting a vehicle parked near the residence. Nelson's inspection revealed a person asleep in the front seat of the vehicle, and Nelson summoned Mackdanz who approached the driver's side with Nelson on the passenger side. Mackdanz described the person as asleep in a slumped position with his head at the driver's door. Mackdanz knocked on the truck's window, but the Defendant did not respond. After knocking on the truck window two or three times, Mackdanz knocked loud enough to arouse the Defendant from his sleep.

Mackdanz asked the Defendant to roll his window down and the Defendant considered this request an "order." (Docket Entry No. 114, Transcript of Second Hearing at 19-20). Again, Mackdanz "briefly" identified himself "with his badge." Id. at 20. According to Mackdanz, the Defendant acknowledged that he was Norman Smith and was cooperative and seemed coherent and normal. (Docket Entry No. 108 at 11, 16). Nelson testified that the Defendant did not appear "hesitant or concerned or scared" and was cooperative. Id. at 69-70. Mackdanz asked the Defendant if he had a computer and used the screen name MrPipe4u2. Id. at 11, 38-40. Mackdanz then told Defendant that the website contained child pornography and gave Defendant the first page of the investigative lead dated January 2006. Id. at 11, 21. Mackdanz asked the Defendant if he had viewed child pornography. Id. at 38. Defendant responded, yes, and that he had been expecting the

---

Nautical Twilight - The time period when the sun is between 6 and 12 degrees below the horizon at either sunrise or sunset. The horizon is not defined and the outline of objects might be visible without artificial light. Ordinary outdoor activities are not possible at this time without extra illumination.

Astronomical Twilight - The time period when the sun is between 12 and 18 degrees below the horizon at either sunrise or sunset. The sun does not contribute to the illumination of the sky before this time in the morning, or after this time in the evening. In the beginning of morning astronomical twilight and at the end of astronomical twilight in the evening, sky illumination is very faint, and might be undetectable.

agents. Id. Defendant testified that after Mackdanz identified himself as a federal agent Defendant thought he was being arrested at that time. (Docket Entry No. 114 at 21).

Mackdanz testified that he was unable to use his cell phone to call for a search warrant because of the rural area he could not receive a signal on his cell phone. (Docket Entry No. 108 at 62-63, 65-66). Mackdanz requested permission to inspect the Defendant's computer. Id. at 42. At that point, Agent Mackdanz assured the Defendant that he would not be arrested that day, and the record clearly shows that Defendant was not arrested until March 27, 2009. Id. at 12-13, 69; Docket Entry No. 4, Arrest Warrant. According to Mackdanz, the Defendant agreed that the agents could enter his residence to inspect his computer. Id. at 42-43. Agent Mackdanz testified that at the initial stop, the Defendant was free to leave and could have left if he put his truck in "reverse, backed up, or he could have finagled his way through those trees and drove out the other side, because there was not another vehicle in that driveway." (Docket Entry No. 114 at 161; Defendant's Exhibit No. 7). The agents testified that neither of them considered Defendant a threat based on their interaction with him, indicating that there was simply no reason to consider using force or coercion. (Docket Entry No. 108 at 43-44, 69-70). Indeed, both agents described Defendant as having been cooperative and compliant. Id. at 16, 47, 70. The agents testified that Defendant appeared coherent and normal, did not exhibit any signs of mental illness, and did not mention anything about Jesus or anything religious. Id. at 16, 71. According to the agents, Defendant thanked them when they left. Id. at 16, 72.

The Government cites the Defendant's statement in his May 2009 interview with Dr. Auble stating that he agreed to talk to the agents, agreed to let them look at the computer, and understood the agents were there because of his child pornography images. The Government cites the lack of any statement by the Defendant that he told Dr. Auble that he felt threatened or scared, saw a

weapon, or did not want to cooperate. Dr. Brown added that "whether it's conscience or unconscious, people sometimes remember things in a way that's more favorable to them, particularly if it has been years after the fact, especially when there is so much for them to lose, such as at a criminal hearing like this. So it's not uncommon, for example, for defendants to make one type of report at the time of the offense, and then for their story to vary over time." (Docket Entry No. 114, at 114-15). Dr. Brown suggested this might have been a defense mechanism for Defendant. Id. at 120-21.

During other parts of his testimony, however, Defendant stated that he "didn't know if he was being robbed" and that he only rolled down his window because he felt threatened and that he had to do what he was told. Id. at 19-20. Yet, Defendant testified that as soon as he saw Mackdanz through the window Defendant "felt that [Mackdanz] was a friend of Jesus'." Id. at 45. When questioned about the contradiction, Defendant was unable to answer: "I didn't know what to think." Id. at 46-47. At no time did Defendant tell Mackdanz that Defendant thought the agent was Jesus or anyone particularly special. Id. at 54.

Defendant was fort-five years old at the time of the incident, is a high school graduate and works as a pipe fitter. Id. at 6; Defendant's Exhibit No. 9. According to Defendant, prior to February 27, 2007, he had been working long hours at the plant, and on February 26th, he worked for 16 hours starting at 2:00 a.m. Id. at 9. On February 27, 2007, the Defendant returned home after an eight hour shift at approximately 5:30 p.m. While driving home, Defendant had difficulty staying awake. At his residence, Defendant, "totally exhausted," "passed out" and fell asleep in his truck outside his residence. Id. at 9-10. Defendant estimated he slept an hour and fifteen minutes. Defendant earlier entered his driveway at an entrance different from the entrances used by Mackdanz and Nelson.

According to Defendant, the agents awoke him by knocking on his truck's window. Defendant initially thought robbery, citing Nelson as looking "very mean" with "his hands together." Id. at 19. Defendant thought Nelson might have a weapon as he was standing on the passenger side of the defendant's truck with his hands cupped in front of him. Mackdanz did not have his hand on his weapon, but had his hand near his weapon for ready access. Nelson was positioned in a similar fashion on the passenger's side. Nelson stated it was possible that his hand was on his weapon, but could not remember. The agents testified that their weapons were holstered at their hip and that they never drew them or threatened to draw them. At that point Mackdanz asked Defendant his name, whether he had a computer and internet access, as well as whether his screen name was "mrpipe 4U2@alo.com" that was subscribed to "Theodore dykstra@hotmail.com" to which the Defendant responded, yes. (Docket Entry No. 108 at 11, 39-41).

According to Defendant, Mackdanz ordered him to the rear of the truck where Nelson patted him for weapons. Mackdanz and Nelson, however, denied such a pat-down occurred. According to Defendant, Mackdanz told him that he had to inspect the Defendant's computer. The Defendant stated that he allowed him to do so because he "felt threatened." (Docket Entry No. 114 at 23). On cross examination, Defendant stated that to leave, he would have had to back out of his driveway that he now does regularly. Id. at 52, 66. Defendant also agreed that no one threatened him, threatened to pull out a gun, or told him he could not leave. Id. at 51-52.

The Defendant also described a "No Trespassing" sign on a tree in front of his home that had been there approximately ten years earlier and had never been taken down until the hearing on December 5, 2011. Id. at 10-16, 48-49. The Defendant introduced photographs of the "No Trespassing" sign on the tree, but those photographs were taken in 2009. Mackdanz did not observe

a "No Trespassing" sign at the Defendant's residence on February 27, 2007. (Docket Entry No. 114 at 161).

During this initial encounter, the agents neither advised the Defendant of his Miranda rights nor his right to refuse their search request. (Docket Entry No. 108 at 21-22).

## 2. The Searches

The parties agree that the agents and the Defendant then proceeded to the residence. After Nelson and Mackdanz entered Defendant's house, Mackdanz asked the Defendant to show the agents his computer. Mackdanz then asked the Defendant to activate the computer and the Defendant "showed him some things." (Docket Entry No. 114 at 24).

With the agents approximately 19-20 inches from Defendant's back, the Defendant accessed his computer. (Docket Entry No. 108 at 51). Defendant's computer displayed a minor, and the minor's genitalia. Id. at 14. Mackdanz estimated the minor to be approximately 12 years of age and concluded the image to be child pornography. When Mackdanz told Defendant that the computer contained child pornography, Defendant stated: "I didn't know if it was or not, that I was under the understanding that it wasn't." (Docket Entry No. 114 at 24). The agents seized the computer and 37 disks that were identified as storing child pornography. Defendant testified that he was told he would not be arrested that day. Id. at 26. According to Defendant, the agents took his disks without Defendant's permission. Id. at 24.

After the agents left the Defendant's residence, Mackdanz took Defendant outside to sign a consent to search form. (Docket Entry No. 108 at 14-15). Although the agents testified that the Defendant was cooperative and did not appear to have any problem with later signing the written consent form in addition to the verbal consent, Defendant testified that Mackdanz told him that he "needed" to sign the written consent form, but Defendant testified he did not want to do so. (Docket

Entry No. 114 at 25). Defendant also testified that he signed this document, but only after agents represented that he would not be arrested and that the evidence would be destroyed. Id. at 25-26, 44. The agents testified that the entire encounter lasted approximately fifteen minutes. (Docket Entry No. 108 at 15, 71).

### 3. Defendant's Mental State

There was expert proof that on February 27, 2007, to the time of the second hearing the Defendant suffers from a delusional disorder, but otherwise functions normally in maintaining an independent life and relationships. (Docket Entry No. 114 at 92). The Defendant believes that he has special insights and powers that originate from God, giving the Defendant special views of reality. In this delusion, the Defendant believes the end of the world is near, and among the last signs of the end of times is the exploitation of children. Id. at 74-75. Before February 27, 2007, Defendant saw a television program portraying clothed children in sexually suggestive poses. Id. at 32-34. The Defendant viewed this program as an extreme case of child exploitation. Defendant decided to secure images of unclothed children that he related to the depiction of the clothed children and considered to be equally reprehensible. Id. at 82-83. In the Defendant's mind, he was going to change the laws to protect and prevent the exploitation of children to save the world. Id. at 76.

According to Dr. Pamela Auble, a psychologist who tested and interviewed Defendant, Defendant believes that "he is on a mission through God, for God, in which he is helping to perhaps change the world, to forestall the end times, which he sees as coming in the very near future, perhaps 2012." Id. at 76. Defendant did not throw his "computer in the river" "because God told him not to." Id. at 89-90. Based on Defendant's explanation at his truck, Defendant "saw Mr. Mackdanz as Christ" or a "Christ-like figure." Id. at 77. According to Dr. Auble, Defendant characterized

9

Mackdanz as "polite," Mackdanz did not threaten Defendant, id. at 84, and Defendant no longer believes Mackdanz is Jesus. Id. at 85. Defendant told Dr. Auble that he collected child pornography "to document the end times." Id. at 82. Yet, Dr. Auble testified that Defendant likely has a prurient interest in these materials. Id. at 83. Dr. Auble opines that due to his delusion, Defendant was "unable to tell Mr. Mackdanz that he wouldn't search his house or that he wouldn't sign something" and was "unable to resist what Mr. Mackdanz wanted him to do." Id. at 77, 78. Dr. Auble opined that she believed that Defendant knew the agents were there to talk about child pornography. Id. at 84. Although other persons believe in the end times, Dr. Auble described Defendant "obsessed and preoccupied." Id. at 89.

Dr. Kimberly Brown, a psychologist who testified for the Government, stated that she reviewed Dr. Auble's tests and agreed that Defendant appeared "excessively virtuous ... not wanting to appear mentally ill." Id. at 103. At the time of the initial encounter, Defendant told Dr. Brown that "he thought that a gun was being held on him" given that Nelson held his hands together, but Defendant never saw a weapon. Id. at 105, 107. Dr. Brown opined that Defendant's "judgment and insight are fairly poor." Id. at 109. Dr. Brown's diagnosis was "delusional disorder provisional," id. at 113, that she described as a "fine" line between "strongly held fanatical religious beliefs and delusions." Id. Yet, Dr. Brown concluded that Defendant's condition is "more like ... a delusion." Id. at 113. Defendant told Dr. Brown that "he felt intimidated by Agent Nelson particularly. Felt scared by him." Id. at 116. As to the officers' requests, Defendant told Dr. Brown that he asked a few times, "do I have to." Id. at 117.

In Dr. Brown's opinion, the "idealization of Agent Mackdanz intensified" after the search. Id. at 118. Dr. Brown also stated that some of Defendant's statements and beliefs expressed after the search are based in reality and are not delusional or symptoms of mental illness. Id. As an

example, Dr. Brown stated that when Defendant was signing the consent form Defendant told the agents that he had been expecting them. Id. Dr. Brown stated that Defendant "explained to me that he had some reasons to believe that he was being watched, whether they were legitimate or not, he believed that his phones had been tampered with. And so there was . . . some awareness, perhaps, that what he was doing was not a legal thing to be doing. So the fact that law enforcement showed up was not a complete surprise for him for those reasons, which I don't consider to be delusional." Id. at 118-19. Dr. Brown stated "before he knew who the agents were or what they were there for, he did have a thought that maybe they were sent to him from Jesus. But at the same time, he also had the thought that maybe they were robbing him." Id. at 119. Moreover, according to Dr. Brown, Defendant stated that "after the agents introduced themselves to him, he said that he said to himself, well, what in the world were you thinking, Norm, thinking he was a friend of Jesus." Id. at 119-20.

Dr. Brown concluded that "there is no information that I have gathered that indicates that Defendant was delusional in regards to Agent Mackdanz, Agent Nelson, or what they were there for that day." Id. at 123. Dr. Brown explains that "delusional people," "seem very normal apart from that specific subject area, and have normal functioning otherwise." Id. at 125.

### B. Conclusions of Law

### 1. Miranda Claim

Defendant contends that at the initial encounter, he was seized without probable cause or reasonable suspicion because the agents had stale information and lacked knowledge of a computer in Defendant's house. Defendant contends this unlawful seizure nullifies any consent to enter his residence and to search and seize his computer and disks. Defendant also cites his defective mental condition, a delusional disorder as precluding any voluntary and knowing consent for the searches and seizures at issue. To justify the agents' conduct, the Government relies upon the "knock and

talk doctrine" that Mackdanz also referred to in his testimony, as well as other proof that Defendant voluntarily consented to the searches.

As a general constitutional principle, a police officer may approach a person on the street without any suspicion and ask questions as well as request identification. Florida v. Royer, 460 U.S. 491, 497 (1983). The Sixth Circuit has held that law enforcement officers may conduct a "knock and talk", that is, go to a home to knock for purposes of speaking with the home's occupants or asking for consent to search the premises, without running afoul of the Fourth Amendment. Hardesty v. Hamburg Twnp, 461 F.3d 646,653 (6th Cir. 2006) (citing United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005)); United States v. Chambers, 395 F.3d 563, 568 n.2 (6th Cir. 2005).[4]

"[T]he 'knock and talk' used by the police is a legitimate investigative technique aimed at achieving a suspect's consent to search," United States v. Lucas, 640 F.3d 168, 174 (6th Cir. 2011), or "when officers reasonably suspect criminal activity." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001). Under this doctrine, "law enforcement officers may encroach upon the curtilage of a home for the purposes of asking questions of the occupants." United States v. Hammet, 236 F.3d 1054, 1059 (9th Cir. 2001). Courts also recognize that the "knock and talk doctrine" does not apply where the agents act in a coercive manner, Florida v. Bostick, 501 U.S. 429, 439 (1991), so as to constitute a "constructive arrest." United States v. Saari, 272 F.3d 804, 811 (6th Cir. 2001).

For a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." United States v. Waldon, 206 F.3d 597, 603 (6th Cir. 2000).

---

[4] Chambers was vacated on other grounds in Kentucky v. King, 131 S.Ct. 1849, 1860 (2011).

> "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity. We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing."

Id. Whether a defendant is in "custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The Sixth Circuit later observed:

> Subsequent to Stansbury, the Supreme Court framed the proper inquiry as involving two essential questions: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The Court directed that "[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id.

> The Sixth Circuit added further guidance on the custody determination in United States v. Salvo, where this Court explained that courts should consider the following factors: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions. 133 F.3d 943, 950 (6th Cir.1998).

Coomer v. Yukins, 533 F.3d 477, 485-86 (6th Cir. 2008).

Yet, a consensual encounter may become a Fourth Amendment seizure if, "'in view of all of the circumstances . . . , a reasonable person would have believed that he was not free to leave. Examples . . . that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon . . . , some physical touching . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" United States v. Wilhoite, No. 02-6373, 86 Fed. Appx. 945, 949-50 (6th Cir. Feb. 6, 2004) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). "Coercion is determined from the perspective of the

13

suspect." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980) and Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). The "test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." California v. Hodari D., 499 U.S. 621, 628 (1991).

The facts in this action are essentially the same as presented in United States v. Tummins, No. 11–6402, 2013 WL 827705 (6th Cir. March 7, 2013). There, the Sixth Circuit summarized:

> County sheriff's officers Levasseur and Patterson executed a search warrant at Tummins' home for computers containing child pornography. The officers arrived at Tummins' home in an unmarked vehicle. They wore plain clothes, with their pistols visibly holstered at their hips. They did not draw their pistols while at Tummins' home, however, nor did they display or use their handcuffs. Tummins answered the door; Levasseur introduced him and Patterson as being from the sheriff's office and asked if they could come inside and talk with Tummins for a minute. They told Tummins they were from the Cyber Crime Unit and that they wanted to know how he connected to the internet. Tummins agreed to show the officers his internet connection and led them upstairs to look at his cable modem.

> Levasseur then told Tummins that he had identified an IP address connected to some shared child-pornography files, which Levasseur said that he downloaded to confirm they were child pornography. Levasseur added that the IP address was associated with Tummins' house, so he had come with a search warrant. Shortly afterwards, Levasseur asked Tummins if he had ever downloaded any child pornography, and Tummins answered that he had. Over the course of the next two hours, Tummins admitted several more times that he had downloaded child pornography. Tummins' wife was present for much of this time and even participated in the conversation. The officers never physically restrained Tummins' movement in any way. At the end of the encounter, Tummins signed an inculpatory statement.

Id. at *1.

The Sixth Circuit concluded:

To determine whether an individual was in custody for <u>Miranda</u> purposes, we must examine all of the circumstances surrounding the interrogation, but we must ultimately determine whether the law enforcement officers restrained the suspect's freedom of movement to the degree associated with a formal arrest. <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (citing <u>California v. Behler</u>, 463 U.S. 1121, 1125 (1983) (<u>per curiam</u>) (rest of citation omitted)). Law-enforcement officers may pressure a suspect to speak without necessarily putting the suspect in custody for <u>Miranda</u> purposes; or, as we have put it, "[t]he question in the end is not whether the individual felt pressure to speak to the officers but whether she was forced to *stay* with them." <u>United States v. Panak</u>, 552 F.3d 462, 471 (6th Cir. 2009) (emphasis in the original). While the record in this case could support a finding that Levasseur and Patterson pressured Tummins to speak to them, the record could not support a finding that they forced Tummins to stay with them.

Here, neither Levasseur nor Patterson forced Tummins to remain with them such that Tummins was in custody to the extent associated with a formal arrest. Indeed, Levasseur's and Patterson's conduct resembles that of other officers in encounters with suspects that we found not to be custodial. <u>See, e.g.</u>, <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir.1999) (agent never made any show of force or brandished a firearm or handcuffs, or any other equipment ordinarily associated with formal arrest or custody); <u>Crossley</u>, 224 F.3d at 862 (agent never brandished a firearm); <u>Panak</u>, 552 F .3d at 467 (investigators did not brandish firearms nor handcuffs); <u>United States v. Hinojosa</u>, 606 F.3d 875, 883 (6th Cir.2010) (officers did not put the suspect in handcuffs or otherwise restrain his freedom). While their pistols were visibly holstered at their hips, neither Levasseur nor Patterson brandished them, nor did they display handcuffs or handcuff Tummins. They never restrained Tummins' freedom of movement to the degree associated with a formal arrest. It is also significant that the entire encounter took place in Tummins' home. <u>See United States v. Panak</u>, 552 F.3d 462, 465–66 (6th Cir.2009) (noting that when police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates <u>Miranda</u> warnings).

Moreover, whether an officer explicitly tells the suspect that he or she is not under arrest is an important part of the analysis of whether a suspect is in custody. <u>United States v. Swanson</u>, 341 F.3d 524, 530 (6th Cir.2003) (citing <u>United States v. Salvo</u>, 113 F.3d 943, 951 (6th Cir.1998)). Where an officer tells a suspect that he or she is not under arrest, we have tended to find that the suspect was not in custody. <u>See, e.g.</u>, <u>Salvo</u>, 133 F.3d at 946 (suspect not in custody where, at the beginning of the encounter, one of the agents told the suspect that he was not under arrest, that he was free to leave at any time, and that he did not have to talk to them); <u>Coomer v. Yukins</u>, 533 F.3d 477, 487 (6th Cir.2008) (suspect not in custody because officer told the suspect that she was not under arrest and that the police would leave if she asked them).

> Here, Levasseur did tell Tummins that he was not under arrest, telling him "[y]ou are not under arrest right now. I'm not here for you, I'm here for your computer, okay?" Later, Levasseur again emphasized Tummins was not under arrest, saying "[l]ike I told you, you're not under arrest. I didn't come here to get you. I come [sic] here to get your computer." These facts further show that the officers did not force Tummins to stay with them.

Id. at 2-3.

Here, the agents approached Defendant in his vehicle that was parked in the driveway of his residence. The agents were in plain clothes and there was not any governmental identification on the front of their vests. Mackdanz showed his badge and identified themselves as ICE agents. Both agents wore bulletproof vests, but only Nelson's vest was marked police on the back of it. Agent Mackdanz testified that at the initial stop, Defendant was free to leave and could have put his truck in reverse and backed out of the driveway. The agents testified that their weapons were holstered at their hip and that they never drew them or threatened to draw them. Defendant agreed that no one threatened him, threatened to pull out a gun, or told him he could not leave. The agents also assured Defendant that he would not be arrested that day.

Accordingly, based upon the binding Sixth Circuit opinion in Tummins, the Court must conclude that Defendant was not in custody for Miranda purposes. Thus, because Defendant was not in custody the agents were not required to advise Defendant of his rights pursuant to Miranda. See Tummins, supra.

## 2. Consent to Search

Defendant contends that because he was delusional he was unable to give a rational, intelligent and informed consent to the agents to search his computer. The Government asserts that Defendant was not delusional and was able to give valid consent. Moreover, the Government contends that even if Defendant were unable to give valid consent to search, Defendant's admission

to viewing chid pornography on his computer established probable cause of a crime and exigent circumstances existed, allowing the agents to conduct a warrantless search of Defendant's computer.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." California v. Carney, 471 U.S. 386, 390 (1985). Accordingly, it is well-established that a search conducted without a warrant and probable cause is per se unreasonable, subject only to several specific exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). One such exception is a search conducted pursuant to consent. Id.

Consent to search must be "freely and voluntarily given," Bumper v. North Carolina, 391 U.S. 543, 548 (1968), and "not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth, 412 U.S. at 228. In Schneckloth the Supreme Court stated, "Our decision today is a narrow one. We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth, 412 U.S. at 248; United States v. Blakeney, 942 F.2d 1001, 1015-16 (6th Cir. 1991) ("Schneckloth involved a consent to search given by a person who was not in custody and specifically reserved judgment on the effect of custodial conditions upon a search authorized solely by an alleged consent."). "'It is the Government's burden by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained.'" United States v. Hinojosa, 606 F.3d 875, 881 (6th Cir. 2010) (citations and internal quotation marks omitted). Voluntariness of a consent to search is a question of fact determined by the Court based upon "the totality of all the circumstances." Schneckloth, 412 U.S. at 227. In determining consent,

the Court should consider, among others, these factors: "'youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.'" United States v. Montgomery, 621 F.3d 568, 572 (6th Cir. 2010) (quoting Schneckloth, 412 U.S. at 226-27) (citations omitted)).[5] While a person's knowledge of the right to refuse is a factor to be taken into consideration in the Court's determination of voluntariness, such knowledge is not a prerequisite to establishing a voluntary consent. Schneckloth, 412 U.S. at 249; Montgomery, 621 F.3d at 574.

The record reflects that the agents were dressed in plain clothes, their weapons were holstered and that they never drew them or threatened to draw them. Mackdanz showed Defendant his badge and identified himself as a federal agent to Defendant. The agents testified that Defendant was cooperative and compliant, seemed coherent and normal, and did not appear hesitant or concerned or scared. Defendant, a high school graduate, told Dr. Auble that he understood the agents were there because of his child pornography images. Defendant presented contradictory

---

[5] Applying the principles of Scheckloth to persons in custody, the Supreme Court in United States v. Watson, 423 U.S. 411 (1976) considered the following additional factors in determining the consent was voluntary:

> (1) there was no overt act or threat of force committed against the defendant; (2) there were no promises made or subtle forms of coercion that might flaw the defendant's judgment; (3) the consent was given in public and not in the police station; (4) the defendant was not a "newcomer to the law"; (5) the defendant was not mentally deficient; (6) the record did not indicate that the defendant was unable, while arrested, to exercise a free choice regarding the consent; and (7) the arresting officers had administered Miranda warnings to the defendant prior to the consent.

Blakeney, 942 F.2d at 1016 (citing Watson, 423 U.S. 411 at 424-25).

testimony, stating at first that he thought he was being robbed, but then stating that as soon as he saw Mackdanz he felt that Mackdanz was a "friend of Jesus'." Defendant did not tell Mackdanz that he thought Mackdanz was Jesus or anyone particularly special. Defendant was not in custody, and Mackdanz assured Defendant several times that he would not be arrested that day. Defendant also signed a written consent form. The entire encounter lasted approximately fifteen minutes.

Both sides presented expert proof that Defendant suffers from a delusional disorder, but that Defendant functions normally in maintaining an independent life and relationships. Dr. Auble opined that Defendant was unable to give consent to the search because of Defendant's delusion in thinking that Mackdanz was a Christlike figure. Yet, Dr. Auble admitted that she believed that Defendant knew the agents were there to talk about child pornography.

Dr. Brown also concluded that Defendant had a delusion disorder, but believed that Defendant's idealization of Mackdanz intensified after the search. Dr. Brown also opined that some of Defendant's statements and beliefs expressed after the search are based in reality and are not delusional or symptoms of mental illness. Dr. Brown opined that Defendant's belief that someone had been watching him and that he had been expecting the agents demonstrate that Defendant was aware that he was doing something illegal and not surprised when the agents appeared. Moreover, according to Dr. Brown, Defendant stated that after the agents introduced themselves to him, he said to himself, "well, what in the world were you thinking, Norm, thinking he was a friend of Jesus." Dr. Brown concluded that "there is no information that I have gathered that indicates that Defendant was delusional in regards to Agent Mackdanz, Agent Nelson, or what they were there for that day." Dr. Brown explained that "delusional people," "seem very normal apart from that specific subject area, and have normal functioning otherwise."

In <u>United States v. Grap</u>, 403 F.3d 439 (7th Cir. 2005), the defendant's mother gave consent to law enforcement officers to conduct a warrantless search of her garage where the defendant had hidden some stolen guns. <u>Id</u>. at 441. The defendant argued that Mrs. Grap's consent was not voluntarily given, presenting the testimony of her husband and psychiatrist that she was mentally ill and therefore lacked the requisite mental capacity for voluntary consent. <u>Id</u>. Mrs. Grap's psychiatrist stated that she was "hospitalized for a delusional disorder that impaired her ability to make rational decisions, and that she refused to take her medication when she was not in the hospital, causing her to become increasingly delusional and out of touch." <u>Id</u>. The psychiatrist testified that Mrs. Grap could appear to be fairly lucid, although she might be in a delusional state. <u>Id</u>. at 441-42. The Seventh Circuit affirmed the district court's denial of the defendant's suppression motion, stating that despite Mrs. Grap's mental infirmities, Mrs. Grap freely and voluntarily consented to the search, that she was aware of all the relevant circumstances of the search and seizure of the stolen guns and that despite the "potentially serious . . . effects of her psychosis, Mrs. Grap's behavior did not indicate that she lacked the requisite mental capacity to consent." <u>Id</u>. at 443. The Seventh Circuit explained:

> The standard of what is reasonably apparent to a reasonable inquiring officer, with its emphasis on the deterrence rationale of the exclusionary rule, is the correct approach. The purpose of suppression of evidence obtained in an unreasonable search is to deter violations by officers of the Fourth Amendment. Obviously, they cannot be deterred by circumstances that are unknown to them, like the psychiatric history of the person consenting to a search. Thus, the exclusionary rule should not be applied when its application will not result in " 'appreciable deterrence.'"
>
> . . . .
>
> The proper inquiry here focuses upon the objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given.

> Of course, in addition, the mental capacity of the person giving consent is only one factor in evaluating his capacity to give voluntary consent. And "[i]t should not be assumed ... that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search." 4 Wayne R. LaFave, Search and Seizure § 8.2(e), at 93 (4th ed.2004).

Id. at 444-45 (citations omitted); see United States v. Ingram, No. 3:10-cr-00069, 2010 WL 5441671, at *11-12 (W.D.N.C. Dec. 28, 2010) (applying the rationale in Grap and concluding that although the consenter suffered from dementia, the officer's conclusion of voluntariness was reasonable in light of the consenter's behavior as presented to the officer); Brewster v. New York, No. 08-CV-4653, 2010 WL 92884, at *7 (E.D.N.Y. Jan. 6, 2010) (rejecting petitioner's claim that he was incapable of giving consent due to a mental disease or defect, the court, citing Grap, explained that the relevant question is not whether petitioner in fact suffered from a mental disease or defect at the time he consented to the search, rather the question is an objective one-whether under the totality of the circumstances was the consent voluntary or involuntary? The court concluded, "There is nothing in the record to suggest that petitioner was not lucid and cooperative while dealing with police. Nor were there signs in the record that petitioner was suffering from delusional symptoms or any other serious impairment that would indicate to a reasonable officer that the consent was not voluntary."); see also Montgomery, 621 F.3d at 572, 573 (rejecting "a per se rule that medication (or intoxication) necessarily defeats an individual's capacity to consent," the Sixth Circuit compared the Fifth Amendment waiver and Fourth Amendment consent-to-search inquiries, and noted, that "the 'knowing and intelligent' prong of the Miranda waiver inquiry is more protective of individual liberty than the consent-to-search doctrine because it requires a '*full awareness* of both the nature of the right being abandoned and the consequences of the decision to abandon it,' namely, a Miranda warning, something not required in Fourth Amendment consent cases.") (citations omitted) (emphasis in original); Colorado v. Connelly, 479 U.S. 157, 166 (1986)

(in the context of determining the voluntariness of a confession where defendant suffered from a psychosis that interfered with his ability to make free and rational choices and exclusively relied on his mental condition, the Supreme Court stated, "Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained."); Clark v. Mitchell, 425 F.3d 270, 283-84 (6th Cir. 2005) (in the context of the voluntariness of a confession, the Sixth Circuit concluded that "borderline retardation" or "low average intellect" was "not dispositive" on the question of voluntariness.).

There is nothing in the record that Defendant acted in anyway that would have alerted the agents that Defendant suffered from a delusion disorder or suffered from any mental illness that would have rendered him incapable of giving his consent to search his computer. Thus, under the totality of all the circumstances the Court concludes that the Government has met its burden that Defendant possessed the mental capacity to give consent and Defendant's consent was voluntarily given and was not the result of duress or coercion, express or implied.

Accordingly, for these reasons, the Court concludes that Defendant's motion to suppress (Docket Entry No. 85) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _10_ day of April, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court